In the Interest of D.W., J.W., and M.W., Minor Children,

B.W., Natural Mother, Appellant.

No. 85–970.

Supreme Court of Iowa.

April 16, 1986.

John R. Donner of Gartelos, Wagner, Mattson, Donner & Long, Waterloo, for appellant.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Sp. Asst. Atty. Gen., Charles K. Phillips, Asst. Atty. Gen., and Sara Kersenbrock, Asst. Co. Atty., for appellee.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McGIVERIN, CARTER, and LAVORATO, JJ.

REYNOLDSON, Chief Justice.

This second appeal in a parent-child termination case is another chapter in the long and tragic history of three children who now have been in foster care for three and one-half years. B.W., natural mother of these children, has appealed from trial court's order terminating her parental rights. We affirm.

B.W., now age twenty-four, is the unmarried mother of four children. Involved here are the three oldest children, each with a different father. We designate them as D.W., a daughter born April 21, 1980; J.W., a son born September 11, 1981; and M.W., a daughter born August 14, 1982.[1]

February 18, 1982, a petition was filed pursuant to Iowa Code section 232.2, alleging the two children then born, D.W. and J.W., were children in need of assistance (CHINA). Following a hearing commencing June 1, 1982, at which the State, mother, and children were represented by different counsel, the juvenile referee found these children to be in need of assistance by "order" dated and filed June 8, 1982.[2] This instrument, pursuant to the 1981 Iowa Code section 231.3, advised the parties of their right to a rehearing before a juvenile court judge by filing a request with the clerk of court within seven days. No party made application for a rehearing. July 7, 1982, the juvenile court judge entered an order adopting the referee's findings of fact, conclusions of law, and judgment as his own. The mother was directed to submit to psychiatric evaluation, a new social contract was to be drafted including homemaker services and establishment of a conservator, the Department of Social Services[3] (Department) was to supervise the children in the mother's home, and the children were to be provided psychiatric examinations. No party appealed from this decision.

M.W. then was born on August 14, 1982. Ten days later the Department removed all three children from their mother's home because she had gone to a bar, leaving her young children (including her ten-day-old baby) with an inadequate baby-sitter. The juvenile court ordered the children to be temporarily placed in foster care. A temporary removal hearing was held. August 27, 1982, the court ordered that the children remain in foster care pending a dispositional hearing. The State immediately filed a CHINA petition on behalf of M.W.

The adjudication hearing on the CHINA petition for M.W. was held concurrently with the dispositional hearing for D.W. and J.W. This combined hearing began on September 9, 1982, but was continued until November 19, 1982, to allow for completion of testimony.[4] By order entered November

1. The fourth child (N.W.) is not involved in this proceeding and was born on July 24, 1983.

2. At the time, a juvenile referee was limited to the role of fact finder. See Iowa Code § 231.3 (1981). In 1983 the referee was granted the same jurisdiction "to issue orders, findings and decisions" as a judge of the juvenile court. 1983 Iowa Acts ch. 21, § 1. This provision is now found at Iowa Code section 602.7103(2) (1985).

3. The title has been changed to the Department of Human Services. See 1983 Iowa Acts ch. 96, § 157.

4. The court apparently continued the hearing to permit the mother to complete her court-ordered psychiatric evaluation so evidence of the results could be introduced. She was extremely uncooperative with those who were to complete the evaluation. She missed five scheduled appointments. When she did attend, the mother

23, 1982, the juvenile court found M.W. to be a child in need of assistance and concluded all three children should remain in foster care while their mother entered into, and attempted to follow, a social contract with the Department.

A review hearing was held three months later on March 4, 1983. The court ordered continued foster care for the children. It also ordered the mother to follow the previous social contract with some approved amendments. The social contract was amended again in June 1983.

Another review hearing was held September 16, 1983. The State requested that foster care be continued, and indicated an intent to file a petition to terminate parental rights. The court ordered continued foster care. The State also requested that visitation between the mother and D.W. be stopped for one to three months based on the recommendation of a psychiatric social worker. The latter thought the visits caused or aggravated many of D.W.'s emotional and behavioral problems. Consequently, the juvenile court discontinued visits between the mother and D.W. for a one-month trial period.

The State filed a petition for termination of parental rights pursuant to Iowa Code section 232.116(5) on September 28, 1983. In an order dated October 27, 1983, the juvenile court discontinued visits between the mother and her daughter, D.W., for an additional two months, but upon application later permitted two December visits with D.W.: one visit with D.W. alone, and another with all three children.

The termination hearing was held January 19 to 27, 1984. The juvenile court, before making a decision on termination, sua sponte raised the issue of a possible defect in the previous CHINA adjudication for D.W. and J.W. The court became con-

vinced the adjudication was based on a ground not alleged in the petition and therefore violated the mother's due process rights.

A CHINA adjudication is a prerequisite to termination of parental rights under Iowa Code section 232.116(5). After further hearing relating to this issue, the court ordered that the termination proceeding be dismissed in seven days on the ground the CHINA adjudication was defective. This provided the State seven days in which to decide upon a course of action.

The State filed an appeal within this seven-day period. Upon the State's application we held the appeal was not from a final judgment, but nonetheless granted permission to appeal. Subsequently, we transferred the case to the court of appeals.

In an opinion filed November 20, 1984, the court of appeals held the mother's due process rights were violated when the juvenile referee found D.W. and J.W. to be children in need of assistance on a ground not alleged and one for which the mother had not been given proper notice. Noting the mother had appeared and was represented by counsel at every stage of the CHINA and termination proceedings, the court of appeals further held she waived the due process requirement of proper notice when she failed to raise or preserve the error at any time prior to the completion of the termination hearing. The proceeding was remanded to the juvenile court for a determination on the merits of the termination petition.[5]

Upon remand, the juvenile court entered an order filed February 18, 1985, terminating the mother's parental rights to all three children pursuant to Iowa Code section 232.116(5).

refused to complete several parts of the tests because she believed the tests were unnecessary.

5. We granted further review only for the limited purpose of addressing the claim, conceded by the State, that the court of appeals exceeded its jurisdiction in an interlocutory appeal by determining the parental relationship between the mother and the third child, M.W., should be

terminated before the juvenile court had acted. We summarily vacated the court of appeals decision in this regard and remanded the case to juvenile court "for further proceedings on the petition to terminate parental rights [to] the three children," consistent with the modified decision on appeal.

One day after the termination order was filed, the mother's then counsel[6] filed an "Application to Reopen Trial for Additional Testimony and Raise Allegation of Ineffective Assistance of Counsel." This pleading tersely alleged the mother wanted to present evidence that she had ineffective assistance of counsel "during her child-in-need-of-assistance proceedings." Thereafter this lawyer, realizing the termination order had been entered, filed a redesignation of pleadings so that the application filed previously was recaptioned as a petition for new trial.

The State resisted the petition and a hearing was held on April 3, 1985. At that time, the juvenile court directed counsel for the mother to submit a separate formal motion on the allegation of ineffective assistance of counsel. The court further indicated a separate hearing then would be held on the motion. The April 3 hearing thereafter proceeded to the remaining issue, the motion for new trial based on newly discovered evidence. Affidavits were submitted by both sides on this issue. After waiting two months with no motion relating to ineffective assistance of counsel being filed, the court entered a ruling denying the motion for new trial on the ground the affidavits raised no new matters that would warrant another trial.[7] It did not specifically address the ineffective assistance ground, no motion having been filed during this period.

The mother now appeals, asserting the juvenile court erred in three ways. She asserts its decision to terminate her parental rights was not supported by clear and convincing evidence as required by Iowa Code section 232.116(5); she was denied a constitutional right to effective assistance of counsel; and her motion for new trial was erroneously denied.

I. *The evidentiary issue.*

We examine this issue with the principle in mind that our review is de novo. We give weight to the factual findings of the juvenile court, especially when the credibility of witnesses is involved. *In re W.G.,* 349 N.W.2d 487, 491 (Iowa 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1212, 84 L.Ed.2d 353 (1985); *In re T.D.C.,* 336 N.W.2d 738, 740 (Iowa 1983).

In this division we are concerned with the third of three statutory requirements imposed by Iowa Code section 232.116(5) before parental rights may be terminated.

5. The court [must find] that:

a. The child has been adjudicated a child in need of assistance pursuant to section 232.96; and

b. The custody of the child has been transferred from his or her parents for placement pursuant to section 232.102 for at least twelve months; and

c. There is clear and convincing evidence that the child cannot be returned to the custody of his or her parents as provided in section 232.102.

Iowa Code § 232.116(5) (1983); *see In re C. and K.,* 322 N.W.2d 76, 78 (Iowa 1982), *appeal dismissed,* 459 U.S. 1094, 103 S.Ct. 711, 74 L.Ed.2d 942 (1983); *see also* Iowa Code § 232.96(8), (9) (further requiring the court to find, in the CHINA proceeding, that the facts are established by clear and convincing evidence before sustaining the petition).

Section 232.116(5)(c) refers to section 232.102(6), which governs review hearings for determining whether a child may be returned to his or her parents. Section 232.102(6) in turn refers to section 232.-2(5),[8] which defines when a child is in need of assistance. Therefore, we have determined that before parental rights may be terminated pursuant to section 232.116(5),

---

6. The mother, B.W., was represented by one attorney during the temporary removal hearing, CHINA proceedings, and review hearings. She was represented by a different lawyer at the termination proceedings, and has an attorney in this appeal who was not involved in any of the prior proceedings.

7. This ruling was filed June 4, 1985.

8. Iowa Code section 232.2(5) was renumbered in 1984 and now appears in the 1985 Code as section 232.2(6). *See* 1984 Iowa Acts ch. 1279, § 1.

"there must be clear and convincing proof that the child[ren] will suffer harm in a manner specified in section 232.2(5)." [9] *In re Chad,* 318 N.W.2d 213, 219 (Iowa 1982).

■ Our central concern in this review is for the best interests of the children. Although there is a presumption the best interests of children are met when they are in the care and custody of their parents, the presumption is rebuttable. *T.D.C.,* 336 N.W.2d at 740. The State must intervene when parents abdicate their responsibility to properly care for their children. *In re Dameron,* 306 N.W.2d 743, 745 (Iowa 1981). Moreover, our termination statute is preventative as well as remedial, and therefore, we will consider the long-range as well as immediate future of the children if they were returned to their mother. Evidence of a parent's past performance is relevant to our review because it "may be indicative of the quality of the future care that parent is capable of providing." *Id.*

■ The State asserts it has shown by clear and convincing evidence these three children will suffer harm from neglect; lack of supervision; and lack of food, clothing, and shelter, as specified in Iowa Code section 232.2(5) (1983), if they are returned to their mother's home. We agree.

The Department's involvement in the current case dates back to 1980, shortly after D.W., the first child, was born. During the intervening years the Department has made intensive but unsuccessful efforts to counsel and train the mother so that she could provide the necessary minimal care for her children.

The record is replete with evidence of B.W.'s failure to supervise and adequately care for her children. The children repeatedly were left with inappropriate baby-sitters while B.W. frequented bars with friends. In one incident, D.W. and J.W. were found sleeping in the living room with their two adult male "baby-sitters" at approximately 2 a.m. J.W. was bruised and suffering from diarrhea; D.W. was naked. The children were removed by a neighbor, apparently without the knowledge or protest of the "baby-sitters," and the police were called. The Department investigated and the alleged "denial of critical care" was substantiated.

In addition, D.W., perhaps because she is the oldest, has displayed disconcerting behavior that we can only attribute to the poor environment provided by the mother. In one instance while D.W. was sitting nude in front of "guests" she placed a hot dog in her vagina and then ate it. When the social worker asked B.W. why her daughter behaved in such a manner, B.W. replied that this ingenious toddler probably thought of this behavior on her own because D.W. is "capable of anything." D.W.'s foster parents reported that when she wanted attention D.W. would disrobe, lay on the floor, spread her legs, and place her hands between her legs.

The children were inadequately supervised even when their mother stayed with them. For example, D.W. received blisters on her lips and mouth after being permitted to come in contact with a rag and bucket filled with a toxic cleanser. In another incident, the cover on the back of the mother's television set had been removed and the interior left unguarded. D.W., then age two, touched the interior of the television and received a shock that knocked her to the floor and caused her eyes to roll back in her head. When the social worker visited the home several days later, the back cover to the television had not been replaced. When questioned, the mother responded that D.W. had now learned her lesson and would know better than to touch the television again.

---

9. Section 232.102(6) requires only a preponderance of evidence that the children will not suffer the harm specified in section 232.2(5) in order to return them to their parents' home. In order to terminate parental rights, however, section 232.116(5) requires a showing by clear and convincing evidence the children *will* suffer the harm specified in section 232.2(5) if they are returned to the home. *See Chad,* 318 N.W.2d at 219 (referring to then section 232.114(5) which now has been renumbered as section 232.-116(5)).

In numerous other incidents, the mother would allow the children to play with the garbage, her lighted cigarettes, and broken toys that had sharp, pointed edges. When these dangerous situations were pointed out to her, the mother again would respond by giving these small children responsibility for their actions. She stated if the children were hurt, they would learn a lesson. This mother consistently has failed to take charge of her situation and accept the responsibilities of motherhood.

As the juvenile court stated, the mother's "housekeeping and parenting skills are almost nonexistent." Garbage, dirty diapers, and dirty dishes were allowed to accumulate for days. Spoiled food was left on the counters and discarded beer cans on the floors.

The mother also was unable to manage her finances. She has been evicted from several apartments. Moreover, she would often use all of her Aid to Dependent Children (ADC) check and her food stamps early in the month so that she would run out of food for the children later in the month. Other times, explaining the children's lack of food, she would claim her money had been lost or stolen. Yet, the mother is a heavy smoker and social workers observed she was never without cigarettes.

To resolve the mother's money management problems, a conservator was placed in charge of her financial affairs. She was uncooperative and even abusive to the social workers when she believed that she was not receiving a sufficient allowance. Laundry was always a problem, but it became worse through the mother's immature efforts to protest against her conservator. Between June 1982 and August 1982, the mother did little laundry, although a social worker had tailored the budget to allow for it. The laundry thus accumulated during those hot summer months, and became maggot-infested by the time the children were removed.

A social worker testified that when she visited the mother's home, the children were often not dressed or dressed in dirty clothes: "When ... it was necessary to take the children out, it would be a method of digging through the clothes that had piled up to be washed to find something that was halfway clean, and many times—these were urine soaked and had dried or had food spilled on them or that kind of thing." The mother often sent D.W. to her preschool class in her pajamas and without a coat in cold weather. On other days the mother shirked her parental responsibilities by expecting the homemaker or social worker to dress D.W. when they came to transport her to school, often causing D.W. to be late.

After almost two years of Department involvement without progress, D.W. and J.W. were temporarily removed from the mother's care on April 9, 1982. They were returned to the mother after the court ordered her to enter into a social contract with the Department.[10] This contract was one of many she made and violated. The instrument contained basic provisions regarding the minimal care of D.W. and J.W. It required B.W. to bathe, clothe, and feed the children; clean the house and take out the garbage, including dirty diapers; cooperate with the homemaker to learn better home management; attend parenting classes and give proper attention to the children; and agree to permit a conservator to manage her finances to avoid the problem of running out of food and losing food stamps.

Less than two weeks passed and the Department was forced to remove the children a second time. The mother had been evicted and the children had no place to stay. The children were returned to her a few days later. Finally, the children were removed in August 1982, after the two toddlers and their ten-day-old sister were left in the care of a young, inexperienced girl so that B.W. could go to the bar with

10. The Department had attempted to enter a social contract with B.W. in March 1982 but she refused to sign. Apparently, even then the

mother did not see the need for a homemaker, parenting classes, and infant stimulation classes.

friends. The baby-sitter was given few instructions, left with little food for the children, and not told where to reach the mother or the approximate time of her return. The court ordered foster care, and after the dispositional hearing, such care was continued.

From this point, a series of court-ordered social contracts were entered into by the Department and the mother. The latter was represented by counsel throughout the negotiation and signing of the contracts. This mother nevertheless failed to comply with any of them, although she was warned repeatedly by the Department and through the many review hearings. For example, she failed to attend or refused to take part in much of the court-ordered psychiatric evaluation. She failed to attend most of the parenting classes.

In June 1983 the March contract was amended to require that B.W. attend a "Young Mother's Support Group" over the summer when parenting classes were not held. The mother attended only one of these sessions, although she admittedly lied and told her social worker that she attended two sessions. While she often attempted to justify her noncompliance by asserting a lack of transportation, the parenting classes were within walking distance and were held during the day.

The mother also failed to comply with the contractual requirement that she receive psychiatric counseling. Two mental health facilities refused to schedule further counseling for her after she missed several successive appointments.

It was the thought of Department counselors, incorporated in a court-approved contract, that this mother, without the obligation of parenting these children, should for the first time seek employment in order to enhance her sense of self-worth and independence. The contract did not require her to obtain employment, but it called for reasonable efforts to secure a job. In this, too, she fell far short, making only a few desultory, unmotivated moves. She failed to enter any of the proffered job training programs and made no effort, over a period of several months, to obtain a social security card. When the mother's pregnancy with her fourth child became obvious, the "pursuing independence" requirement of the social contract was deleted.

This mother's lack of parenting ability is reflected by testimony and videotapes, taken with her consent, of her visits with the children. Several of the visits were held at the Department because she was unable to provide a proper home environment.

During the weekly visits, B.W. would spend most of her time sitting in a chair and smoking cigarettes rather than playing and talking to the children. Instead of feeding and nurturing M.W., the mother would prop the bottle up next to the infant so that she could feed herself. The other children often became rough and destructive in their play, using furniture for toys. The mother would give verbal directives to the children without moving from her chair. After repeating the directive several times, she would either take care of the matter herself or forget about it. The children were allowed to ignore her.

The therapist repeatedly suggested the mother follow through on her orders to the children by physically intervening in these situations. No progress was made, however, because the mother quickly fell back to her pattern of yelling verbal commands at these young children. Consequently, the visits sometimes turned into chaotic meetings as her low stress tolerance became evident. She often entered "screaming matches" with the children, who by that time were throwing and pounding on things. During one visit, B.W. repeated a command no less than twenty-two times, never leaving her chair and all the while puffing on cigarettes. After the yelling and occasional swatting subsided, the mother sometimes ignored the children entirely, telling them the screaming "doesn't bother me a bit."

The evidence also shows little nurturing and bonding between the mother and her children. She rarely initiated any type of affection or gesture toward the children. She instead expected the children to nur-

ture her. If the mother played with the children, she would do so with only one child for a very brief period, ignoring the others completely. The family therapist testified that "as far as bonding in which there is affection, nurturance, guidance from a parent to a child, that was never observed on a consistent basis between [the mother] and any of [her] children." The family therapist further testified that the children thought of their mother as just "another adult," for they interacted with themselves rather than approaching her.

The therapist determined the mother's "own individual needs preclude her ability to understand and fulfill [the needs] of her children." This inability was reflected when she begged her social worker to return her children so that she could once again receive ADC. She stated she needed the ADC so that she could leave the man she was living with.

The mother's life has been difficult and troubled, which may explain the current situation with her children. Her mother had a series of marriages and affairs, resulting in a total of eight children born in and out of wedlock. B.W. was taken from her mother by the Department and placed with her father. Apparently, she did not receive the necessary care and nurturing from her father, and this void was reflected by her increasing emotional problems. She was referred to the Black Hawk-Grundy Mental Health Center for psychiatric evaluation and counseling at age eleven. Later B.W. was hospitalized at Allen Hospital Psychiatric Ward. From that point she spent time in various counseling institutions and youth shelters before returning to her father's home at sixteen, where, after a brief relationship, she became pregnant at age seventeen.

The parties do not dispute that the mother has a borderline personality disorder. Her own expert witness testified she has demonstrated the following traits:

[A] great impulsivity, unpredictability, unstable interpersonal relationships are suggested, wide mood swings, irritability characterized by inappropriate and in-

tense anger, lack of control over anger. Internal controls are by and large not well established. There is uncertainty about who she is and what she seeks to accomplish in life.

Evidence presented by the State regarding this mother's personality disorder was similar. She was described as having

significant problems in impaired judgment, low stress tolerance, and with dependent and depressive features. Borderline personalities frequently have adequate intelligence but function within the borderline retarded range. They tend to be impulsive and lack insight. They frequently are involved in life crises. They are usually not able to develop meaningful interpersonal relationships. They are usually marginal people who need the support of some societal system such as welfare and other county and state aid programs. They tend to be dependent on society.... Prognosis is significantly guarded and potential for sustained change is minimal.

The record discloses that persons with a borderline personality disorder also have a high risk of being abusive and neglectful. Their chronic depression often results in low energy levels, making it difficult to meet the needs of young children.

Despite these evaluations, the mother consistently has denied that she has a problem. She testified that she does not need psychiatric treatment. Although therapy was a part of B.W.'s social contracts, she missed most of the scheduled appointments with different counselors, who were provided at public expense. The witnesses on both sides agreed that therapy is useless as long as the mother refuses to acknowledge her need for help and resists all efforts made by the various county and state agencies. Further, without such therapy the prognosis is extremely dim because the problems only become compounded.

The mother's personality contributes to her inability to provide a stable environment for the children. Although the exact number is disputed, the mother has moved at least thirty-three times since the Depart-

ment became involved in 1980.[11] During this period she had affairs with several different men, and, characteristic of her personality disorder, she has been unable to maintain a stable relationship with any of them.

This type of life obviously affected these children. Signs of emotional problems were detected in D.W., the eldest daughter, at the age of two. At that age she unsuccessfully engaged in oppositional or negative behavior, often escalating to violent tantrums as a means of obtaining the much needed attention of her mother. Once placed in foster care, this daughter began receiving psychiatric treatment. The State's witnesses testified that D.W.'s behavior has improved since she has been placed in the stable environment of her foster home. Bonding has developed between this daughter and her foster mother, who she now refers to as "mom." Nevertheless, progress is slow and she will need further counseling and a stable environment. In her report, the psychiatric social worker who is treating this daughter stated that the developing relationship between D.W. and her foster mother was healthy and could be used as a therapeutic treatment tool. Further, the daughter "needs to be able to relate to one parenting person who can and is willing to provide the predictable emotional components." Because the mother cannot provide the necessary support for this daughter in the foreseeable future, the social worker recommended that the court sever her parental rights. Signs of similar emotional and behavioral problems also have been detected in J.W., the son, although they are less severe.

The experts on both sides agreed the children cannot be returned to the mother at the present time. She argues here, however, that one or two of the children should be returned to her if she is unable to handle all three children. The mother has one child, N.W., at home now, and the Department is closely monitoring that situation.

Moreover, the record shows the mother was unable to focus her attention on more than one child at a time even in the Department's small visiting room.

Believable witnesses expressed concern this mother may not be able to handle the child still at home. She refuses to obtain psychiatric counseling for herself. Based on these facts and others in the record, we cannot find that trial court erred in failing to return one or more of the children to her keeping. It is noteworthy that counsel for the children fully supported the position of the State at the termination hearing.

The mother's expert witness recommended that the children should be placed in long-term foster care while she is given another chance to obtain the required parenting skills. The expert conceded his plan is plagued with a "high risk of failure." These children have been in foster care since August 1982. The Department was involved even before that time and has continued to make intensive efforts to counsel and train this mother. Unfortunately, she has not cooperated.

We do not doubt the mother's love for her children, but we must act in the best interests of the children. As we have written in a similar case, "we cannot gamble with the children's future. They must not be made to await their mother's maturity." *In re Kester,* 228 N.W.2d 107, 110–11 (Iowa 1975). We will not deny these children a chance at a brighter future by causing them to suffer in parentless limbo for several more years based on the forlorn hope this mother will finally face her problems, accept counseling, and develop minimal parenting skills. *See Dameron,* 306 N.W.2d at 747; *Long v. Long,* 255 N.W.2d 140, 146 (Iowa 1977).

A passage from *In re Voeltz* is applicable here:

In describing [C] we do not speak in a spirit of criticism, but with a sense of sadness. We appear to be dealing with an inadequate person and we must state

---

**11.** The State asserts the mother moved 38 times during this period. Dr. Scott, the mother's expert witness, stated in his report that she moved 33 times, and B.W. argues she moved only 20 times.

the facts as we find them. [M], [T], and [P] cannot continue in their parentless limbo. Child custody should be quickly fixed and little disturbed. These children have been living in foster care for over three years; the longer they remain in foster care the more difficult a suitable adoption becomes.

Notwithstanding [C's] interests as mother, the best interests of the children dictate a severance of their mother's parental rights.

271 N.W.2d 719, 724 (Iowa 1978) (citations omitted).

We hold the juvenile court's termination order was supported by clear and convincing evidence.

## II. *The ineffective assistance of counsel issue.*

In this appeal the mother argues that but for ineffective assistance of counsel, both in the CHINA proceeding and the termination proceeding, her parental rights would not have been terminated. She asserts her counsel in the CHINA proceeding failed to raise the issue that the petition alleged one ground (Iowa Code section 232.2(5)) for a CHINA finding, but the juvenile court based the adjudication on a different ground under that section. Implicated, of course, are our decisions in *In re Hewitt*, 272 N.W.2d 852, 854–57 (Iowa 1978), and *In re Meyer*, 204 N.W.2d 625, 626–27 (Iowa 1973), holding that under the facts in those cases and the statute as then written, this lack of notice of the issue to be presented to the juvenile court deprived the parent of due process. *See In re Robbins*, 230 N.W.2d 489, 491 (Iowa 1975) (termination case). The mother's contention in this and the prior appeal is that had this alleged defect been timely raised the State would have been required to amend or refile its CHINA petition. Significantly, we can find no place in this record where she has ever claimed surprise or prejudice as a result of this purported procedure flaw.

In this appeal, by still a third attorney, she implies her second lawyer who represented her at the termination hearing also was ineffective because he did not raise the defect alleged above at that proceeding. Had this been done, she further implies, the State would have been required to go back to square one with another CHINA proceeding and another year's foster home placement pursuant to Iowa Code section 232.116(5)(b).

The mother argues we should reverse the termination ruling on the above bases, or at least remand for hearing on these issues in juvenile court. For the reasons set out below, we find we are not compelled to hold these young lives in suspension any longer.

The resolution of the mother's contentions does not require us to engage in the balancing analysis to determine whether she had a due process right to appointed counsel in the CHINA proceeding. *See Lassiter v. Department of Social Services*, 452 U.S. 18, 31, 101 S.Ct. 2153, 2161–62, 68 L.Ed.2d 640, 652 (1981); *In re Jacobs*, 309 N.W.2d 481, 483 (Iowa 1981). The mother was furnished appointed counsel pursuant to a statute, Iowa Code section 232.89, as were the children.

For the purposes of this case we will assume, as the State seems to concede, that in these situations due process requires counsel appointed under a statutory directive to provide effective assistance. *See In re Voeltz*, 271 N.W.2d 719, 722 (Iowa 1978). Although the sixth amendment is not implicated here, we nonetheless will apply the same standards adopted for counsel appointed in a criminal proceeding. *See, e.g., Strickland v. Washington*, 466 U.S. 668, 687–98, 104 S.Ct. 2052, 2064–70, 80 L.Ed.2d 674, 693–700 (1984); *State v. Losee*, 354 N.W.2d 239, 243–44 (Iowa 1984); *State v. Neal*, 353 N.W.2d 83, 86–87 (Iowa 1984). This follows the practice of other courts confronting such claims in termination cases. *See State v. Anonymous*, 179 Conn. 155, 159–62, 425 A.2d 939, 942–43 (1979); *cf. Bruner v. Dunning*, 731 F.2d 527, 528 (8th Cir.1984) (The ineffectiveness claim arose out of a state termination proceeding although it was asserted in a later federal section 1983 action.).

The *Strickland* principles require the party claiming ineffective assistance of counsel to show (1) that counsel's performance was deficient, and (2) that actual prejudice resulted. Unless both showings are made, the claim must fail. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Our scrutiny of the CHINA counsel's performance must "be highly deferential," *id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694, and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [party] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. at 2066, 80 L.Ed.2d at 694–95 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83, 93 (1955)); *see Taylor v. State*, 352 N.W.2d 683, 685 (Iowa 1984).

We conclude the record now before us is adequate to support our determination that counsel's performance in the CHINA proceeding was not deficient, and that no actual prejudice resulted.

### A. *Counsel's performance.*

The petition for the CHINA adjudication was filed February 18, 1982. It alleged the mother had abused and neglected D.W. and J.W. "contrary to and in violation of Section 232.2 of the ... Code of Iowa Subsection 232.2(5)(b)." Among the specific factual allegations were charges of denial of critical care, concerns about the mother's parenting ability, lack of food and milk, and leaving the children unsupervised. Other allegations related to abuse and bruises on the children.

Applying the strong *Strickland* presumption that the CHINA counsel's conduct fell within "the wide range of reasonable professional assistance," we may assume that he learned from his client or other sources the distressing details of her conduct and inadequacies, together with

her long-term involvement with the Department.[12]

The Department's "narrative highlights," relating to the mother and her care of her children, introduced as an exhibit in this proceeding, shows twenty-six entries in 1980 (commencing June 10, 1980), forty-three entries in 1981, and thirty-three entries in 1982 up to the date of the hearing on the CHINA petition in June. Many entries relate to instances of failure to provide adequate food and clothing, forced moves, temporary loss of ADC due to the mother's failure to forward address changes, police involvement, uncooperative conduct with homemakers and social workers, failure to attend parenting classes, injuries to the children, and other events that the mother would know or that minimal inquiry would disclose. In this category, we would place two removals of the children from the mother's home by the Department. Some of the entries related to complaints from friends, landlords, homemakers, and others concerning dirty conditions in the home; the mother's neglect of the children; and her apparent drug and alcohol abuse, that an attorney's ordinary investigation might not have revealed. Clearly, however, there was an easily available history that would have alerted counsel to the State's concerns and the type of evidence that would be produced.

Nor do we have any reason to conclude that in preparing to defend the charge of abuse and neglect, counsel did not consider the amplified definition then found in Iowa Code section 232.68:

As used in this chapter, unless the context otherwise requires:

. . . .

(2) "Child abuse" or "abuse" means harm or threatened harm occurring through:

. . . .

(c) The failure on the part of a person responsible for the care of a child to provide for the adequate food, shelter, clothing or other care necessary for the

---

12. "It is fair to assume, in most contexts, that lawyers know what their clients know...."

*Celestine v. Veterans Administration Hospital*, 746 F.2d 1360, 1362 (8th Cir.1984).

child's health and welfare when financially able to do so or when offered financial or other reasonable means to do so. Iowa Code § 232.68 (1981).

The "order" entered by the juvenile referee in this case, later adopted by the court, recited that "testimony in support of the Petition" was presented in three categories:

a. That the children and more specifically, [D.W.], had been abused by virtue of inappropriate discipline.

b. The natural mother's inability to budget money for food and shelter.

c. The natural mother's alleged inadequate parental abilities.

Because of their importance to the ineffective assistance issue, we now set out the CHINA court's findings on these issues:

## ABUSE

The evidence focused on two incidents of abuse, one occurring in May, 1981, and the other in August of 1981. The May incident involved a deep bruise on [D.W.'s] buttocks. The investigation conducted by the Child Abuse investigators substantiated the fact that the child was abused on this occasion, but was unable to determine the identity of the perpetrator. The second incident occurring in August, 1981, involved what appeared to be a "hand" shaped bruise on [D.W.'s] buttocks. Investigation of this incident established that this bruise was inflicted by a [C.S.], who the record reveals to be a boyfriend of the natural mother's sister.

In view of the fact that Section 232.-5(b) requires that the abuse must be inflicted by the "parent, guardian or other custodian," these two incidents of abuse cannot form the basis of declaring these children to be in need of assistance.

## BUDGETING

The testimony established that the children's mother, [B.W.], is incapable of budgeting the money she receives in the form of A.D.C. payments and the assistance she receives by way of food stamps.

Frequently, over the past year, the social service workers reported a lack of sufficient food and milk in the home to provide adequately for the two young children.

Additionally, [B.W.] over the past year has moved from place to place frequently.

It appears clear from the evidence that these deficiencies result from [B.W.'s] inadequate abilities to handle her money and food stamps.

Rather than purchasing groceries and milk several times a month, a practice she has been advised to follow, she purchases her entire monthly food supply at the time when she receives her monthly food stamp allotment.

Invariably, then, before the month is up, she runs out of food and milk.

This is not a situation where there is inadequate money with which to purchase food, although the Court is not unmindful of the financial difficulties of a single mother supporting two children on welfare allotment, it is rather the result of the mother's inability and unwillingness to plan ahead in spending her money.

The evidence indicates that a conservator has now been appointed to assist the mother in budgeting her money. [The mother's] attitude with respect to the conservator, however, is that she was "tricked" into accepting a conservator, under threat of losing her children.

[The mother] has demonstrated an unwillingness to accept the help and constructive suggestions of the various social service workers designed to improve her abilities as a parent.

This attitude is shown by her unwillingness to accept the services of a homemaker in her home, her refusal to attend a parenting class sponsored by a local hospital, as well as general refusal or inability to live up to the terms of the "social contract" which she signed with the Department in April of 1982.

The Court concludes, therefore, with respect to this category, that clear and convincing evidence exists that the children's mother has failed to exercise a minimal degree of care in supplying the children with adequate food and shelter, and refuses other means made available to provide such essentials; see Section 232.5(g).

## PARENTING ABILITIES

Evidence was also presented to demonstrate that [B.W.], the natural mother, lacks essential abilities as a parent, in that the children on numerous occasions appeared unkempt, dirty, ill-clothed, as well as inadequately groomed. In addition, there was testimony that the various homes of the children were dirty, with clothes strewn around, and dirty dishes in the sink.

Although a picture emerges that [B.W.'s] abilities as a homemaker leave much to be desired, it is the opinion of the Court that these inadequacies do not rise to the level where they create conditions which are imminently likely to have harmful effects upon the children. See Section 232.5(c)(1).

Additionally, although the petition alleges that the children have been left unsupervised, no credible evidence was presented in support of this contention.

Following these findings, the court's "Conclusion" states:

The Court concludes, therefore, that the children in this case are Children in Need of Assistance, *particularly* as defined in Section 232.5(g), Code Iowa 1981. . . .

(Emphasis added.)

■ It is apparent the mother and her counsel had adequate notice of the grounds relied on by the State in the CHINA proceeding, the evidence would have come as no surprise, and the court's factual findings satisfied the 1981 Iowa Code section 232.68 definition of "abuse," which was one of the charges.[13] It also is apparent that the court's statutory references were developed on still another definition of "abuse or neglect" found at section 232.2(37) of the 1981 Code, where it is defined as "any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent, guardian or custodian or other person legally responsible for the child." The court did so, despite the reality that the factual allegations of the petition and the evidence conformed to the section 232.68 definition.

In these circumstances we find there was no deficient performance on the part of the CHINA counsel in not, within the seven-day period provided by Iowa Code section 231.3 (1981), directing the court's attention to this anomaly. That it was later exploited as a violation of the rule laid down in our *Hewitt* and *Meyer* decisions cannot be controlling when the CHINA decision was never reviewed and the ultimate conclusion, in a collateral attack, that there was a due process violation was reached without the issue being raised that there was a different code and different statutes involved in those cases. The underlying rationale of *Hewitt* and *Meyer* was lack of jurisdiction of the mother because the juvenile court based its decision on a ground unrelated to that alleged in the petition, thus depriving the mother of adequate notice and an opportunity to prepare. *Hewitt*, 272 N.W.2d at 854–56; *Meyer*, 204 N.W.2d 626–27. Here the allegations of the petition, the evidence, and the findings were all in conformance with respect to the conduct of the mother. This, under the Iowa Code section 232.68 definition, was sufficient to support a CHINA adjudication. That the CHINA court may have made reference to a different code section

---

**13.** The court's findings also would have supported a finding of neglect under section 232.-2(5)(b). *See In re K.L.C.,* 372 N.W.2d 223, 228 (Iowa 1985) (This court found the mother's transient existence, inadequate parenting skills, and failure to respond to Department services warranted a finding that the children involved were likely to suffer neglect under section 232.2(5)(b) if returned to their mother.).

was at most an error at law that did not void its basic determination.

Had the CHINA counsel pointed this out to the court, it may have corrected its ruling or may have noted, as we have observed, that the error was without substantive consequence. What the Connecticut court wrote in *State v. Anonymous* is applicable here:

> Moreover, the record indicates that the [mother] was sufficiently apprised to prepare her defense. Trial counsel's failure to make merely pro forma motions to correct or dismiss without a showing of resulting prejudice to the [mother] does not amount to ineffective assistance of counsel.

179 Conn. at 161, 425 A.2d at 163.

Although the holding of the court of appeals, that there was a due process violation, may have become the law of the case in other respects because the analysis we have made, above, has never been presented at any stage of this or the CHINA proceeding, that decision does not affect our conclusion that the CHINA counsel's performance at the time was not deficient.

### B. *Lack of prejudice.*

■ Our inquiry could end here, but we further find the record discloses nothing the CHINA counsel did prejudiced this mother. Much of what we have written above applies to this prong of our *Strickland* analysis.

The CHINA court's findings clearly indicate the evidence was explored fully. The record in this termination case, extending over the period prior to the time of the CHINA hearing, discloses there was every reason to hold these children to be in need of assistance. There was still more reason to remove the children from her home on the subsequent dispositional hearing. We find there were no viable grounds for the CHINA counsel to make application for interlocutory appeal from the CHINA decision, or a direct appeal from the dispositional ruling. *See In re Long*, 313 N.W.2d 473, 475–77 (Iowa 1981).

■ Because we find there was no ineffective assistance of counsel in the CHINA proceeding, it follows that counsel in the termination proceeding was not ineffective in not raising the issue. *See Hall v. State*, 360 N.W.2d 836, 839 (Iowa 1985) ("Our finding that failure of Hall's trial counsel to pursue certain evidentiary issues was not ineffective assistance of counsel because it represented a reasonable choice of trial tactics, and, in any event, the issues not pursued were lacking in merit, removes any basis for favorable consideration of Hall's additional claim that these issues should have been pursued by counsel on his direct appeal.").

### III. *The new trial issue.*

■ The mother asserts trial court erred in denying her motion for new trial based on newly discovered evidence. The court found the new evidence submitted on behalf of the mother did not warrant a new trial. *See* Iowa R.Civ.P. 244(g).

We do not favor motions for new trial based on newly discovered evidence. Such motions are "closely scrutinized and granted sparingly." *Vanden Berg v. Wolfe*, 196 N.W.2d 420, 422 (Iowa 1972). Generally, a party must make the following showing in support of his or her motion:

> [T]hat the evidence is newly discovered and could not, in the exercise of due diligence, have been discovered prior to the conclusion of the trial; that it is material and not merely cumulative or impeaching; and that it will probably change the result if a new trial is granted.

*In re Marriage of Steenhoek*, 305 N.W.2d 448, 452 (Iowa 1981).

In the ordinary case, newly discovered evidence is evidence that existed at the time of trial but for some justifiable reason was not produced at trial. *Mulkins v. Board of Supervisors*, 330 N.W.2d 258, 261–62 (Iowa 1983). The mother freely admits here that her evidence did not exist at the time of trial. We need not decide, however, if the present case is so extraordinary that it triggers an exception to the

above requirement. The motion fails on another ground: The affidavits submitted on behalf of the mother are not likely to change the result. B.W.'s distaste for the Department and her social worker was brought out in trial, and therefore, her affidavit is merely cumulative.

Further, the affidavit of a nutritionist working with the mother at the time of the new trial motion does not reflect evidence that probably would change the current result. As the State points out, a nutritionist, unlike those who testified at the hearing, is not a specialist in the area now of concern to us. The nutritionist's affidavit was refuted effectively by the State, and even when standing alone, reflected the mother still had difficulties maintaining her commitments.

The juvenile court did not err in denying the motion for new trial, and we affirm its termination judgment.

AFFIRMED.