# IN THE COURT OF APPEALS OF IOWA

No. 19-1495
Filed April 29, 2020

**IN THE INTEREST OF L.C., A.S., and V.F.,**
**Minor Children,**

**M.F., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.

A mother appeals the order terminating her parental rights to her three minor children. **AFFIRMED.**

Elena Greenberg, Des Moines, attorney for appellant mother.

Thomas J. Miller, Attorney General, and Meredith L. Lamberti, Assistant Attorney General, for appellee State.

Michael Sorci of Youth Law Center, Des Moines, attorney and guardian ad litem for minor children.

Considered by Bower, C.J., and Greer and Ahlers, JJ.

**AHLERS, Judge.**

A mother appeals the order terminating her parental rights to her three minor children, A.S., L.C., and V.F.[1]    She argues the evidence submitted was insufficient to terminate her parental rights, termination is not in the children's best interest, and the permissive factors in Iowa Code section 232.116(3) (2019) preclude terminating her parental rights.  She further argues the court appointed special advocate (CASA) had a conflict of interest that deprived her of her right to due process of law under the Fourteenth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution.

## I.  Factual and Procedural Background

The children first came to the attention of the Iowa Department of Human Services (DHS) in August 2017 after an anonymous tip informed the DHS the father had used cocaine and heroin in A.S. and L.C.'s presence.[2]  A DHS worker contacted the mother and learned the father had overdosed on heroin and was hospitalized in January 2017.  The mother agreed to a safety plan under which L.C.'s father would not have unsupervised visits with the children and would not stay overnight at the mother's residence.

The DHS worker contacted the father and informed him of the allegations about his heroin use in the children's presence.  The father admitted to using heroin up until March 2017, but denied keeping it or using it around the children.   He

---

[1] L.C. and V.F.'s biological father's parental rights were also terminated in the same proceeding.  He does not appeal.  For the sake of simplicity, all references to "the father" refer to L.C. and V.F.'s biological father.  A.S.'s father's parental rights were terminated in an earlier proceeding.
[2] V.F. had not been born at the time.

agreed to follow the safety plan. After repeated reports the father was regularly staying overnight at the mother's residence and continued to use drugs at the residence in violation of the safety plan, the children were removed from the mother's care and placed with their maternal grandmother by court order in October 2017.

Children-in-need-of-assistance (CINA) proceedings were started on A.S. and L.C. and a CASA was appointed for the children. The children were adjudicated to be CINA. At the time of original disposition, the court declined to return the children to the mother, finding she "remains in an unhealthy, deceitful and dangerous relationship with" the father, and she was in a worse position to regain custody of the children than at adjudication.

After V.F. was born in the fall of 2018, the mother entered into another safety plan under which the father was not allowed in the residence and unannounced visits would occur to ensure compliance. The mother was also given six more months to work on reunification with A.S. and L.C. During this period of time, the mother was discovered to have a black eye on at least two occasions. She claimed the black eyes were caused by a crib falling on her and being elbowed in a bar fight.

Less than two weeks after the safety plan for V.F. was agreed to, during an unannounced visit by a family safety, risk, and permanency (FSRP) worker, the father was found to be at the mother's house in her bed. V.F. was removed from the mother's care the next day and placed with her siblings. A no-contact order was issued prohibiting the mother and the father from having contact with each other.

Despite the no-contact order, the mother continued to have contact with the father. In the first month after entry of the no-contact order, the mother and father were seen together in a vehicle. The following month, the father was hospitalized after collapsing on the mother's bathroom floor. The father was arrested in January 2019. The mother had repeated contact with the father while he was in jail, including bringing the children with her to the jail when the mother was allowed to visit the children. The mother repeatedly lied about her contact with the father, but her contact was confirmed by jail logs and the call log from the mother's phone.

A contested permanency hearing took place in April 2019 at which the DHS recommended terminating the mother's parental rights.[3] The CASA filed a report that recommended the mother's parental rights be terminated. During the permanency hearing, the DHS worker testified that the concurrent plan was for the grandmother to adopt A.S. and L.C. and noted the CASA had offered to be considered as a potential concurrent plan to adopt V.F. to keep the children in contact. The mother moved to remove the CASA from the case and for a finding that the State had not made reasonable efforts to reunite the mother with the children. The juvenile court rejected the mother's arguments, noting:

> The Court specifically denies the mother's claim the CASA offering to be considered as a potential concurrent plan for [V.F.] is a lack of reasonable efforts. The Court finds the CASA has been an excellent worker on this case. Her reports have been very detailed and thorough. She has acknowledged the mother's strengths and her more recent significant struggles. The Court believes CASA offered to be considered as a potential concurrent plan because this family situation is incredibly sad and concerning. Despite years of services, the mother remains unchanged; focused on herself and her drug addicted, violent boyfriend. The grandmother, as a sole care provider, is taking care of the three children and her son. She is

---

[3] By this time, the parental rights of both fathers had already been terminated.

exhausted and worn out.  The CASA knows the children will probably not be able to stay in a family unit, but wants them to maintain contact with each other.   By offering to be considered as a potential concurrent plan, she was kindly trying to step in and fill that need.

The juvenile court directed the State to petition for termination of the mother's parental rights.    Two days after the permanency hearing, the CASA program coordinator removed the CASA, citing her "conflict of interest."

A termination hearing occurred in May 2019, after which the juvenile court terminated the mother's parental rights to A.S. under Iowa Code section 232.116(1)(f), and to L.C. and V.F. under Iowa Code 232.116(1)(h).  The mother appeals.

## II.  Standard of Review

We review termination proceedings de novo.  *In re M.D.*, 921 N.W.2d 229, 232 (Iowa 2018).  "Although we are not bound by the juvenile court's findings of fact, 'we do give them weight, especially in assessing the credibility of witnesses.'" *Id.* (quoting *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010)).  Our primary concern is the best interest of the children.  *Id.*

## III.  Statutory Grounds for Termination

The juvenile court terminated the mother's parental rights to A.S. under section 232.116(1)(f) and her parental rights to L.C. and V.F. under section 232.116(1)(h).  On appeal, the mother disputes only the fourth element of both grounds, which require the State to show the children could not be returned to the mother's custody at the time of the termination hearing.  *See* Iowa Code § 232.116(1)(f)(4) ("There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in

section 232.102."); *id.* § 232.116(1)(h)(4) ("There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time."). "Evidence is 'clear and convincing' when there are no 'serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence.'" *D.W.*, 791 N.W.2d at 706 (quoting *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010)).

As detailed above, the mother repeatedly lied to the DHS and the juvenile court about her involvement with the father and continued to place her relationship with him over the children's needs. Suspected incidents of domestic violence have also occurred between the mother and father.

Beyond her relationship with the father, the mother has also entered into a relationship with another drug-involved man in the months since the father's incarceration. The mother started a relationship with D.D., a man who lived in her apartment complex, sometime in the spring of 2019. In April, law enforcement officers arrested the mother after it was discovered the mother, while working at a pharmacy, stole another person's Percocet pills and passed them through the pharmacy's drive-thru window to D.D. The mother told the officers D.D. threatened to hurt her at home or attack her place of work if she did not supply him with the pills.

Throughout these proceeding, the mother could not set appropriate boundaries and choose her children over her relationships with drug-involved men, despite repeated warnings and over a year of services offered to help her do so. On our de novo review, we conclude the State has met its burden to show the children could not be returned to the mother at the time of the termination hearing.

**IV. Best Interest of the Children**

The mother also argues termination of her parental rights is not in the children's best interest. "When we consider whether parental rights should be terminated, we 'shall give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren].'" *In re M.W.*, 876 N.W.2d 212, 224 (Iowa 2016) (quoting Iowa Code § 232.116(2)).

A.S. and L.C. have been removed from the mother's care since October 2017. V.F. was removed soon after she was born in September 2018. "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *P.L.*, 778 N.W.2d at 41. "Insight for the determination of [the children's] long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" *In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) (quoting *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000)). As discussed above, the mother is unable to provide a safe home for the children after more than a year of services. Her decisions have already had a significant negative impact on the oldest child, A.S. She continues to prioritize her relationships with drug-involved men over the safety of her children. Termination and placement in a permanent home will allow the children to be placed in a nurturing, stable home.

## V. Permissive Factors

The mother argues the factors in Iowa Code section 232.116(3) preclude terminating her parental rights. The section 232.116(3) factors are "permissive, not mandatory." *In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014). "We may use our discretion, 'based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship.'" *M.W.*, 876 N.W.2d at 225 (quoting *A.M.*, 843 N.W.2d at 113). The only factors applicable here are section 232.1163(a) and (c), which apply when "A relative has legal custody of the child" or "There is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship."

The juvenile court addressed both factors in its order terminating the mother's parental rights and concluded neither warranted declining terminating the mother's parental rights. Like the juvenile court, we acknowledge that the mother loves the children and has a bond with them. Nothing in the record suggests termination would be detrimental to the children based on the closeness of that bond. On our review, we conclude the permissive factors in section 232.116(3) do not apply to preclude termination.

## VI. Conflict of Interest

The mother argues she was denied due process of law by the CASA's conflict of interest. She argues the CASA's reports are tainted by her conflict and, because the guardian ad litem (GAL) relied on the CASA's reports, the GAL could not effectively represent the children's interest as well. While we recognize the impropriety of the CASA remaining involved in the case after offering to be a

placement option for one or more of the children due to the conflict of interest it creates, we find the mother's due process rights were not violated.

We note neither the mother nor the State has identified any case law addressing conflict-of-interest challenges regarding CASAs in their appellate briefs. Nevertheless, we will address the issue. To begin, we note Iowa Code section 232.2(22)(a) defines "guardian ad litem" to include CASAs. However, there are important differences between a CASA and a GAL, which caution against applying the same standards to both. For example, while section 232.2(22)(a) defines a GAL to include a CASA, that same section prohibits CASAs from filing various motions and petitions that a traditional GAL would be allowed to file. Furthermore, CASAs are not required to be licensed to practice law. Additionally, in this case, an attorney was appointed to serve as attorney and guardian ad litem for the children. As a result, the CASA appointed was an additional GAL for the children and, therefore, not the sole person looking out for their interests.

Given the differences between a CASA and a traditional GAL, including the fact the CASA is not required to be an attorney with the corresponding ethical and legal obligations, a strong argument can be made that the standards for addressing conflicts of interest with respect to a CASA should not be as stringent as those applying to a traditional attorney GAL. However, assuming without deciding that we should apply the same standard to CASAs that we apply to traditional attorney GALs, the mother has not met her burden under that standard.

Even if we were to apply the same standards to a CASA as to counsel appointed for the children, the mother still cannot prevail. Terminations are civil proceedings. *In re T.P.*, 757 N.WW.2d 267, 274 (Iowa Ct. App. 2008). "As no

Sixth Amendment protections are implicated, there is no constitutional right to effective assistance of counsel." *Id.* (citing *In re D.W.*, 385 N.W.2d 570, 579 (Iowa 1986)). "Nevertheless, due process requires that counsel appointed pursuant to a statute provide effective assistance." *Id.* "We generally apply the same standards for counsel appointed in a criminal proceeding to counsel appointed in a termination proceeding." *Id.* In the context of conflict-of-interest claims, "it must be proved that an actual conflict existed and actual prejudice resulted." *Id.* To show actual prejudice, the mother must show "that but for the actual conflict, the result of the termination of parental rights proceedings would likely have been different." *Id.* at 275. This she cannot do for either the CASA or the GAL. Information about the mother's ability to maintain appropriate boundaries and put her children first was obtained from DHS reports, FSRP worker reports, the maternal grandmother, phone logs, police records, and testimony from individuals other than the CASA. Additionally, as previously noted, the CASA was removed from involvement in the case when the conflict of interest came to light. That removal occurred before these termination proceedings were filed. Due to the independent sources of information presented at the termination hearing, the mother has not shown actual prejudice resulted from the CASA's conflict of interest. In other words, even if the CASA's reports, involvement, and recommendations are ignored, the result would be the same.

**AFFIRMED**.

**GREER, Judge** (concurring specially).

I specially concur in the majority decision to terminate the mother's parental rights. Substantial evidence beyond the court appointed special advocate's (CASA)[4] detailed reports existed to support the decision to terminate, and the mother failed to show prejudice from the conflict created by the CASA. *See In re J.P.B.*, 419 N.W.2d 387, 391 (Iowa 1988) (stating that in juvenile proceedings, "where the objective is *always* the best interest of the child," we will not presume prejudice results from a conflict of interest). But I write to address the conflict-of-interest argument this mother appropriately raised during the juvenile court permanency hearing and in this appeal. The Iowa Department of Human Services (DHS) worker assigned to this case announced to the juvenile court at the permanency hearing that the CASA had offered to be considered as a "potential concurrent plan" to adopt the youngest child, V.F. The mother immediately objected, asserting that conflict tainted the independence of the entire process because of the CASA's recommendation to terminate the mother's parental rights.

Because of the objective of advocating for the best interests of the child, the distinction between whether the conflict involved a CASA or a guardian ad litem (GAL) is a distinction without a difference in this case. Some authorities address the role of the GAL in this vein:

---

[4] "Court appointed special advocate" means

> a person duly certified by the child advocacy board created in section 237.16 for participation in the court appointed special advocate program and appointed by the court to represent the interests of a child in any judicial proceeding to which the child is a party or is called as a witness or relating to any dispositional order involving the child resulting from such proceeding.

Iowa Code § 232.2(9).

> Unhampered by the *ex parte* and other restrictions that prevent the court from conducting its own investigation of the facts, the [GAL] essentially functions as the court's investigative agent, charged with the same ultimate standard that must ultimately govern the court's decision—i.e., the "best interests of the child." The [GAL] is less concerned with providing counsel and advising the children and more concerned with reporting accurately the familial history and relationships of the parties to the dispute and the resulting impact on the current and projected future well being of the children.

Linda D. Elrod, *Child Custody Practice & Procedure: Traditional guardian ad litem—Best Interests of Child vs. Child's Preference* § 12.8 (Feb. 2020 update). Because a CASA is court appointed and acts as an advocate, there exists a potential for the court to rely upon reported factual findings developed during the interviews and meetings with the CASA. Yet the State argues and the majority discusses differences between a CASA and a GAL and advocates for different standards related to a conflict of interest. Any person charged with authority to recommend termination, as the CASA did in her report, whether it is a DHS worker, a CASA, or a GAL, cannot avoid a conflict if he or she also wishes to be considered for adoption. *See Conflict of Interest, Black's Law Dictionary* (11th ed. 2019) ("A real or seeming incompatibility between one's private interests and one's public or fiduciary duties."); *see generally In re Marriage of Long*, No. 02-1326, 2003 WL 21075734, at *2–3 (Iowa Ct. App. May 14, 2003) (concluding an "inherent conflict of interest" existed where the child's therapist, acting as an advocate for the child, believed when deciding whether the father could exercise visitation "that only he could resolve the visitation issue"—not any other therapist).

So our standard must be a conflict-free process. Here most concerning is that not only did the CASA create the conflict, but the DHS worker knew and apparently failed to appreciate a conflict. Several days *after* the permanency

hearing, but before the termination proceedings, the CASA program coordinator acknowledged the conflict of interest in a filed report removing the appointed CASA. Surprisingly, the juvenile court did not initiate that removal. We are unaware of the date the CASA requested consideration as an adoptive placement, but that is the date disclosure to the juvenile court and a request for removal was required. I only write separately to suggest it makes little difference who created the conflict, as the potential harm to the process exists in spite of the distinction.