# IN THE COURT OF APPEALS OF IOWA

No. 14-2045
Filed February 11, 2015

IN THE INTEREST OF N.L.-S., A.L.-S., I.L.-S., I.L.-S., D.L.-S., AND D.L.-T.,
Minor Children,

G.S, Father,
Appellant,

D.L., Mother,
Appellant.
_____

Appeal from the Iowa District Court for Woodbury County, Julie A. Schumacher, District Associate Judge.


Parents appeal separately the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**


Daniel P. Vakulskas of Vaskulkas Law Firm, P.C., Sioux City, for appellant father.

Joseph Flannery of Law Office of Joseph W. Flannery, P.C., Le Mars, for appellant mother.

Thomas J. Miller, Attorney General, Janet L. Hoffman, Assistant Attorney General, Patrick Jennings, County Attorney, and Dewey Sloan, Assistant County Attorney, for appellee State.

Joseph Kertels of the Juvenile Law Center, Sioux City, attorney and guardian ad litem for minor children.


Considered by Vogel, P.J., and Doyle and McDonald, JJ.

**PER CURIAM.**

A mother and father appeal separately the termination of their parental rights—the mother to her six biological children and the father to his five, of the six, biological children. The mother argues the court failed to consider her positive progress in the case and that she should have been given additional time for reunification. The father challenges the grounds for termination and asserts termination was not in the children's best interests. Upon our de novo review of the record, we affirm.

### I. Background Facts and Proceedings.

D.L., born in 1991, is the mother of six children, of which D.L.-T. is the oldest, born in 2008, and N.L.-S., born in 2014, is the youngest. G.S. is the biological father the five youngest children, but he served as a father to eldest child as well.[1] Both parents have limited cognitive abilities that have affected their parenting skills. The father also has a history of substance abuse, as well as unsavory affiliations, including gang involvement.

The family first came to the attention of the Iowa Department of Human Services (Department) in December 2010 after it was reported the father was using and selling methamphetamine and marijuana. It was also alleged the mother had punched the eldest child, then two-years old, in the back. At that time, the mother only had two children, and the parents were living with and receiving significant support from the father's parents. The parents denied ever hitting the child; no bruises were observed, and the child was too young to be interviewed. The abuse report was not confirmed, but the father did test positive

---

[1] D.L.-T.'s father's parental rights are not at issue in this appeal.

for methamphetamine. The parents agreed to participate in voluntary services, and the father attended and ultimately successfully completed substance abuse treatment. The case was closed in 2011, when the mother was pregnant with her third child.

The family again came to the Department's attention in 2013, after the school reported the oldest child, then five, came to school with bruising, puffiness, and redness in his left eye. The child told a school administrator the father had struck him in the eye with a spoon for playing soccer in the house. A Department worker went to the house and saw the child had a red, puffy eye. The child reported to her the father hit him with a belt. Beyond the red eye, the worker did not see any injuries and scheduled an appointment at the hospital for ultraviolet photographs to be taken. There were also reports of drug use by the parents.

A few days after the incident, the child told the interviewer at the advocacy center that he "got a bruise and felled on [his] head" because he "didn't get [his] socks on." The child initially stated no one hurt or hit him, but he amended his answer to "When I be naughty." He stated that when he is naughty his paternal grandmother spanks him, but he asked the interviewer not to tell his mother. The ultraviolet and white-light photographs taken indicated the child had some bruising and discoloration of the skin on his face, back, and leg, and the reviewing doctor opined the bruised areas were not in areas normal for accidental injury. Thereafter, the father admitted that, in disciplining the child, he would hold the child down while the paternal grandmother struck the child two or three times over clothing. He denied any physical abuse.

The mother was then interviewed. At that time, she was pregnant with her sixth child. The mother admitted she and the paternal grandmother had disciplined the oldest child by spanking, either by hand or belt. She stated the father usually held the child down rather than giving the spanking because it was believed the father would hit too hard. She denied any physical abuse, including the child's report about his eye injury, at first claiming the child ran into something and later that the child got into a fight at school. The grandmother gave a different "accidental" account of the child's eye injury. All five children were then removed from the parents' care and placed in foster care, where they have since remained.

After the removal, hair-stat tests were performed on four of the children, and all four tested positive for methamphetamine. Additionally, one child tested positive for ingestion of methamphetamine. Both parents tested positive for methamphetamine. Several of the children were found to have developmental and social delays, and two of the children were not receiving regular nebulizer treatments for their asthma as directed. The children were subsequently adjudicated children in need of assistance (CINA). The sixth child was adjudicated a CINA after her birth in February 2014.

The parents continued to live with the father's family and were completely dependent on them for shelter, transportation, and financial management, as well as assistance parenting the children. However, there were numerous concerns raised about the environment of the family's home, including drug usage, gang activity, and physical abuse in the home. Additionally, it was reported the children lacked developmental opportunities because they were isolated within

the family home and the family lacked knowledge of age-appropriate discipline. There were also ten people living in the home. It was determined the children could not be returned to that residence because of safety concerns, and it was recommended the parents obtain their own residence.

Numerous services were offered to the parents, including substance abuse and mental health evaluations, and the parents were generally cooperative with the recommendations following their evaluations. Following her evaluation, the mother's mental health evaluator opined that, "[c]onsidering [the mother's] intellectual level and personality makeup, the expectation that [she] can provide a truly healthy, nurturing environment with responsible parenting seems unlikely. Close supervision and services would likely be needed." The assessment following the father's evaluation was similar, concluding his "responses often revealed very poor insight into problem situations that might be relevant for parenting."

The parents were particularly open to services and recommendations concerning their visits with and parenting of the children. They attended every visit, arrived on time, brought dinner, and provided the basic necessities for the children and their foster families. The parents were motivated to learn new parenting skills and techniques, and they attended parenting classes. The parents eventually moved into their own apartment, and visits were held there.

Yet, despite the continued supervised visits, receipt of parenting information, and the parents' overall motivation and love of the children, the parents never progressed to a point that the Department felt the children could be transitioned into semi-supervised visits with just the parents without the

possibility of some adjudicatory harm to the children. The service provider reported the parents lacked follow through on parenting skills, discipline techniques, and assignments given to them. The provider also reported she continually worked with the parents on time outs, planned ignoring, staying calm, non-violent discipline techniques, and appropriate parenting skills. The parents did not believe the children's safety or welfare were at risk, stating the children "are the world to us and [the Department is involved] because of one big mistake that we did [and our children] are paying."

The provider noted the children's initial developmental delays, such as the older children's very minimal vocabulary and the oldest child's inability to follow simple directions like putting on or taking it a seat belt off. The provider believed all three older children had lacked proper structure or routine, and they continued to struggle with following rules or listening. After placement in foster care, the children began to thrive. The three boys were initially placed together in one home, and the twin girls were placed together in a different home. All five children made developmental gains in the areas of speech, behavior, physical health, affect, and personality. The children responded well to the structure and consistency provided by the foster parents. The sixth child was placed in the foster home with the twins after her birth.

In July 2014, the State filed a petition for termination of the parents' parental rights. At the hearing, the case worker testified the parents loved their children very much, but she explained the parents' progress was stagnant and continued services would not aid their parenting ability. She admitted the parents had asked the Department to transition a few children to their care at a time, to

see if the parents could handle it. However, she explained she did not believe that was an available option, noting the children were not "guinea pigs," there would be stress on the children as to whom they picked, and ultimately, the parents had six children to care for, not just a few. Following the hearing, the court entered its order terminating the parents' parental rights pursuant to Iowa Code subsections 232.116(1)(d) and (h) (2013).

The parents now appeal, separately.

## II. *Discussion.*

In determining whether parental rights should be terminated under chapter 232, the juvenile court "follows a three-step analysis." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Step one requires the court to "determine if a ground for termination under section 232.116(1) has been established" by the State. *Id.* If the court finds grounds for termination, the court moves to the second step of the analysis: deciding if the grounds for termination should result in a termination of parental rights under the best-interest framework set out in section 232.116(2). *Id.* at 706-07. Even if the court finds "the statutory best-interest framework supports termination of parental rights," the court must proceed to the third and final step: considering "if any statutory exceptions set out in section 232.116(3) should serve to preclude termination of parental rights." *Id.* at 707. We review the parents' claims on appeal de novo. *See In re A.M.*, 843 N.W.2d 100, 113 (Iowa 2014).

### A. *The Father's Appeal.*

### 1. *Grounds for Termination.*

The grounds for termination must be proved by clear and convincing evidence. Iowa Code § 232.116(1) (2013); *see also D.W.*, 791 N.W.2d at 706. When the juvenile court terminates parental rights on more than one statutory ground, we may affirm on any ground we find supported by the record. *D.W.*, 791 N.W.2d at 707; *In re R.R.K.*, 544 N.W.2d 274, 276 (Iowa Ct. App. 1995). We choose to focus on subsection 232.116(1) paragraph (h), which requires the State to prove by clear and convincing evidence that (1) the child is three years of age or younger, (2) has been adjudicated a CINA, (3) has been removed from the physical custody of the child's parents for at least six months of the last twelve months, and (4) there is clear and convincing evidence that the child cannot be returned to the custody of the child's parents at the present time. Here, there is no question the first three elements were established: the father's five biological children were age three or under, were adjudicated CINA in 2013, and removed from his care for the requisite time period. The only debatable issue is the fourth element, and, upon our de novo review, we find the State has met its burden on this element as to both parents.

As we have stated many times, children lack pause buttons. Their crucial days of childhood cannot be suspended while waiting for a parent to remedy a lack of parenting skills. "At some point, the rights and needs of the child rise above the rights and needs of the parents." *In re J.L.W.*, 570 N.W.2d 778, 781 (Iowa Ct. App. 1997), *overruled on other grounds by In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010); *see also P.L.*, 778 N.W.2d at 39-40. At the time of the

termination hearing, these young children had been out of the father's care for over six months. And, despite the receipt of numerous services, the father was unable to progress to a point where he could resume care of his five children without exposing the children to the risk of adjudicatory harm. While lower mental functioning alone is not sufficient grounds for termination, it is a relevant consideration where it affects the child's well-being. *See A.M.*, 843 N.W.2d at 111. Here, the father hit a five-year-old in the eye for playing soccer in the house, and he never accepted responsibility for his actions. These children suffered developmental delays for which he and the mother did not seek assistance. His children tested positive for methamphetamine—one had even ingested it—yet he did not think his children were at risk. Moreover, although the father was attending substance abuse treatment, his recent marijuana relapse, coupled with his continued unsavory social associations, make his continued commitment to sobriety at this time or for the foreseeable future unlikely. While the father was making an effort to participate in services, there was simply not evidence he understood, internalized, or retained the information necessary to parent successfully and keep safe five young children. Upon our de novo review, we agree with the juvenile court that the evidence presented at the termination-of-parental-rights hearing clearly established the children could not be returned to the father's care at that time. We therefore agree the State established termination of the father's parental rights was appropriate under Iowa Code section 232.116(1)(h).

### *2. Best Interests.*

Our legislature has constructed a time frame to balance a parent's efforts against the children's long-term best interests. *In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000). We measure best interests by the statutory language, giving primary consideration to the children's safety, and to the best placement for promoting their long-term nurturing and growth and their physical, mental, and emotional conditions and needs. Iowa Code § 232.116(2). "The mental capacity of a parent and the existence of a preadoptive foster family in the life of a child" are relevant considerations in the statutory best-interest analysis. *D.W.*, 791 N.W.2d at 708. Consequently, "the termination analysis considers the ability of the parent to properly care for the child and the presence of another family to provide the care." *Id.* "[W]e cannot deprive [children] of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home." *A.M.*, 843 N.W.2d at 113. Termination is the appropriate solution when a parent is unable to regain custody within the time frames of chapter 232. *See In re C.K.*, 558 N.W.2d 170, 174 (Iowa 1997) ("An appropriate determination to terminate a parent-child relationship is not to be countermanded by the ability and willingness of a family relative to take the child."). Upon our de novo review, we agree with the juvenile court that the considerations guiding the decision support termination.

Here, despite ongoing services from the Department, the father failed to show the kind of progress during this case while the children have been out of his care to merit prolonging the uncertainty. The case progress reports and the case

worker's testimony indicate the father has difficulty overcoming his intellectual impairment to provide an adequately safe and reliable home for the children without relying heavily on service providers or his parents. As his five children continue to grow and develop, their need for physical, mental, and emotional guidance, as well as financial support, will only become more challenging. The children have made significant developmental gains in their preadoptive foster homes, and all evidence suggests that they will continue to do so. We are simply not convinced that the father has developed the skills necessary to cope with the critical needs of five young children in the statutory time frame allotted to him and accordingly find the factors of section 232.116(2) support termination.

### B. The Mother's Appeal.

The mother makes a passionate argument asserting the juvenile court ignored the positive reports and accomplishments the mother made during the duration of the case, including her commitment to attending mental health and substance abuse treatment. She essentially asserts she deserved, based upon her efforts, additional time for reunification and a trial-visitation period with a few of her children so she could demonstrate she could safely parent them. While we applaud her efforts, we disagree for the same general reasons stated addressing the father's appeal.

Here, the mother's mere participation in services was not enough to evidence she could safely care for six young children. Her children tested positive for methamphetamine, but she did not believe her children were at risk, stating she only believed the Department was involved because of the one incident concerning the child's eye, and she minimized that incident. These

children suffered developmental delays in her care. While she went through the motions in cooperating with the services provided, she, like the father, demonstrated no real progress or follow through to show she understood the risks to her children and why the services were necessary. We do not "'gamble with the children's future'" by asking them to wait continuously for a stable biological parent, particularly at such tender ages. *In re D.W.*, 385 N.W.2d 570, 578 (Iowa 1986) (citation omitted). There is no question the mother loves her children, but unfortunately, that was not enough to keep them safe prior to the Department's most recent involvement, and it is still not enough now. Upon our de novo review, we find the juvenile court appropriately considered the mother's progress and participation in services in the case in its determination that termination of her parental rights was in their best interests. We, like the juvenile court, find the children's need for permanency outweigh the mother's limited progress, and the children should not have to wait any longer. The children are doing well in their preadoptive placements, and all evidence suggests the children will continue to thrive in their foster families' care. Taking into account the relevant factors, we agree with the juvenile court that the children's best interests are served by severing their legal tie with the mother.

### III. Conclusion.

For the foregoing reasons, we affirm the juvenile court's order terminating the parents' parental rights.

**AFFIRMED ON BOTH APPEALS.**