# IN THE COURT OF APPEALS OF IOWA

———————

No. 25-0623
Filed June 10, 2026

———————

**Michael George Hatfield,**
Plaintiff–Appellant,

v.

**Union Pacific Railroad Company,**
Defendant–Appellee.

———————

Appeal from the Iowa District Court for Cerro Gordo County,
The Honorable Colleen Weiland, Judge.

———————

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS

———————

Michael T. Blotevogel (pro hac vice) (argued) of Dripps & Blotevogel, LLC, Maryville, Illinois; James Fitzsimmons, Mason City; and Frederick W. James of RSH Legal, Des Moines, attorneys for appellant.

Jonathan B. Amarilio (pro hac vice) (argued), J. Timothy Eaton (pro hac vice), Benjamin S. Morrell (pro hac vice), and Adam W. Decker (pro hac vice) of Taft Stettinius & Hollister LLP, Chicago, Illinois; and Torry Garland and Betsy Seeba-Walters, Omaha, Nebraska, attorneys for appellee.

———————

Heard at oral argument by Tabor, C.J., Sandy, J., and Doyle, S.J.
Opinion by Sandy, J.

**SANDY, Judge.**

The district court put it well: "[t]elevision writers might have come up with" the events that played out during trial in this case. But the miraculous revelation of "new" evidence during jury deliberation, no matter how important it would have been during trial, does not justify the granting of a new trial if it would have not changed the trial's ultimate result. Because the evidence at issue in this appeal would not have changed the result of the trial, the district court abused its discretion in granting a new trial. For the reasons stated below, we reverse the district court's order granting Union Pacific Railroad Company's motion for new trial and remand for entry of an order consistent with this opinion. But we affirm the court's denial of Michael Hatfield's post-trial motions.

## BACKGROUND FACTS AND PROCEEDINGS

In January 2019, Hatfield was a locomotive engineer for Union Pacific. On January 11, Hatfield was working in the company's Mason City railyard. With the help of Mark Nelson and conductor James Thoen, Hatfield was "switching and classifying" railcars from one rail to another, which involves using a locomotive operated by Hatfield to couple railcars together before moving them between tracks. When coupling railcars, Hatfield had a blind view of the track and depended on Thoen to inform him from the ground on how far one railcar was from the other. That information allowed Hatfield as the locomotive engineer to slow down the locomotive before the moment of coupling to allow for a "soft joint" of the railcars. During railcar switches, a "switch list" is consulted, which itemizes every car involved and the track to which each car is being relocated.

When coupling one set of cars, Hatfield claimed that Thoen told him that he needed to back up the distance of ten railcars to make a coupling. As

Hatfield approached the railcar, Thoen told him that he was then seven cars away, and as Hatfield got closer, Thoen updated him with a new number. Hatfield—not having slowed down in anticipation of the coupling—then made contact with the railcar earlier than he expected, resulting in a "really hard joint" of the railcars. That coupling "propelled" him from his seat and caused Hatfield to hit his head on a window. Locomotive recording data shows that the train went from traveling at eight miles per hour to zero in approximately two seconds. Hatfield informed a nurse at Union Pacific of this event several days later, but he only reported a "neck/throat sprain or strain" and declined further medical care. Hatfield also saw his personal doctor the same day as the incident but told the doctor he was visiting for back pain that had started several weeks before. He did not mention the hard coupling that occurred earlier that day. Hatfield claimed that he reported the incident to his manager, Mike Lollar, after visiting the nurse. He testified that Lollar rejected his request to get the video footage because Lollar did not want to "provide [him] with evidence."

Following accidents or other events causing damage to company property, Union Pacific internal policies require that the parties involved complete a "705 report." A 705 report contains "a concise narrative account of the accident," the location, a description of damage and injuries, who was involved, and other "particulars of the accident or matter." Any injury, "no matter how slight, must be reported," according to the report instructions. Although Hatfield reported his injury to the nurse three days after the incident, he never filled out a 705 report. Company policy also dictates that a "Form 52032" be filled out following an injury-causing incident. Forms 52032 serve the purpose of informing the company of potential mechanical, environmental, and human factors that may require change for prevention of future injuries. Hatfield did not fill out a Form 52032 until October. The

three-day delay in that initial report to the nurse combined with Lollar's refusal to pull video footage meant that interior and exterior train video footage—which is automatically erased after seventy-two hours—had been deleted.

Additionally, the report of an incident involving an injury-related rule violation would result in the involved employees being drug tested.[1] Due to the delay in reporting, no such drug test occurred here. Nicki Banks, a senior manager at Union Pacific testified that had Hatfield requested further medical care or reported the incident, it would have triggered Federal Railroad Administration reporting requirements for further investigation. And according to Banks, because Hatfield declined further medical attention from the nurse, no requirement for investigation was triggered.

Before his injury, Hatfield had reported hostility from other coworkers. In 2018, he reported receiving threatening letters, typically with "some sort of target around [his] name" and insulting Hatfield and his wife. Some of these letter were also sent to Union Pacific. Despite investigations by federal, state, local, and internal authorities, no perpetrator was ever identified. Hatfield requested a transfer which was denied. He was instead demoted from his senior management position to engineer. Hatfield contended that this decision made the situation worse and put him in an "abusive environment" because he was more directly exposed to the employees he believed were threatening him. During this time—prior to the incident in this case—Hatfield reported that he was being given incorrect railcar counts

---

[1] Hatfield had been prescribed opioids and muscle relaxers—classified as restricted drugs by the Union Pacific—but testified he had not consumed them prior to his shift on the day of the incident.

during couplings and that he was receiving incorrect counts from multiple conductors.

Hatfield was promoted after the rough-coupling incident and transferred to Oregon. Hatfield testified that in addition to his back problems, he was "struggling mentally" in Oregon. He was still managing the "really bad stuff" he had "put up with," and his wife was still living in Iowa. Ultimately, Hatfield took leave and never returned to Union Pacific.

In August 2021, Hatfield filed two negligence claims against Union Pacific under the Federal Employers' Liability Act (FELA). Count I was based on Hatfield's injuries resulting from the rough-coupling incident and count II was based on his mental injuries resulting from the threats he received from 2018 to early 2019.

Relevant to this appeal, Hatfield's discovery requests included a request that he be provided "[a]ny accident forms, statements, whether written or oral, and subsequently transcribed, or any other memoranda or data pertaining to any statements given by any witness(es) to [Union Pacific] regarding the occurrences which are the subject matter of the instant suit." Union Pacific responded that it was "not in the possession of any accident forms or statements given by witnesses."

Thoen, the conductor directing Hatfield from the ground during the incident, was deposed but did not testify at trial. In his deposition, he denied any memory of the rough-coupling incident: "I don't recall the specific event that you're asking about." Thoen further denied ever purposely giving an incorrect railcar count to an engineer, nor had he attempted to "set up an employee to become injured." Although he was not asked about documents, Thoen did not ever suggest he was in possession of documentation or reports

related to the rough-coupling incident. Nelson, who was also on the ground at the time of the incident, likewise declined having any memory of the hard-joint incident and testified to such at trial. Nelson additionally stated that he would have remembered a rough joint. Upon receiving a subpoena to testify, Thoen informed Union Pacific that his wife was in a car accident, and it would be difficult for him to testify. Neither Hatfield nor Union Pacific called Thoen to testify at trial.

Much of the trial revolved around Hatfield's credibility, whether a rough-coupling incident had actually occurred, and what caused the incident. To counter Hatfield's claims relating to incorrect railcar counts and his subsequent back problems following the incident, Union Pacific sought to show that he was uncredible and that the incident in question did not occur. Union Pacific highlighted inconsistencies in Hatfield's claims about his back pain and PTSD, as well as false information in his educational record submitted to Union Pacific. Union Pacific also pled the affirmative defense of comparative fault, directing the jury to consider that Hatfield may have been under the influence of prescribed opioids, thus delaying his report to avoid drug testing, and that he was exceeding the railyard speed limit while piloting the locomotive.

Union Pacific moved for a directed verdict on count II, which asserted standalone emotional injuries resulting from "harassing or threatening letters, drawings, personal communications, et cetera, before" January 11, 2019. The district court granted the motion, but it found the jury could still consider the harassing communications as evidence relevant to the emotional injuries alleged in count I.

The jury began deliberation on May 28, 2024. Thoen contacted Union Pacific attorney Torry Garland that evening. Thoen and Garland met, and

Thoen showed Garland a previously undisclosed 705 report from the date of the incident and an original switch list. Thoen did not hand over the documents to Garland, and Garland gave Thoen the email and phone number of Hatfield's counsel. Garland described the documents as corroborating Hatfield's report that a rough-coupling incident had occurred. Garland informed Hatfield's counsel and the court of this development. Possible resolutions were discussed and the court ordered[2] the jury to continue its deliberations. Following deliberations, the jury found Union Pacific to be negligent and assessed damages at $288,350 in future medical care and supplies, $750,000 in pain and suffering, and $1,000,000 in loss of earnings, totaling $2,038,350 in damages. This total award was reduced to $1,019,175 to account for fifty-percent fault by Hatfield.

Union Pacific moved for new trial under Iowa Rule of Civil Procedure 1.1004(7) (based on the newly discovered evidence) and (8) (based on the court's admission of the threatening letters). Hatfield moved to strike the jury's comparative negligence finding, arguing that the finding was unsupported by the evidence and that striking the affirmative defense was a proper sanction for Union Pacific's purported suppression of the 705 report and switch list. Hatfield alternatively moved for new trial on the issue of comparative fault.

The district court held a post-trial evidentiary hearing on September 4, 2024. Thoen testified at this hearing. Thoen's 705 report, dated January 19, 2019 (the day after the incident), stated that, on the day of the incident, he was to make a joint on track 11. He realized midway through

---

[2] It is unclear from the record whether the decision to allow for the jury to continue deliberations notwithstanding the new disclosure was by agreement of the parties. However, no motion for mistrial was made by either party.

the joint that he was looking at the cars on track 12 and relaying incorrect information to Hatfield. Thoen confirmed that he must have filled out the report shortly after the incident, and the information in the report would have been accurate to his recollections at that time. He claimed not to remember filling out the report, where he got the form, to whom he turned in the report, or why he still had the report. Yet Thoen claimed to have told Nelson about the report. Thoen was also ordered to play a recording he had secretly made of his May 28, 2024, conversation with Union Pacific's counsel when he first disclosed existence of the document.

The district court granted Union Pacific's motion for new trial on all issues and denied Hatfield's post-trial motions. Finding that "Thoen is not a friend to either party—he is hostile to and suspicious of both Hatfield and Union Pacific," the court determined that the new 705 report and switch list constituted newly discovered evidence that "could not with reasonable diligence have been discovered and produced at the trial" and "the evidence [would] probably change the result if a new trial is granted." Citing the general rule that all issues should be retried together, the court also stated that "the determination of damages is intertwined with questions of liability."

Hatfield now appeals.

## STANDARD OF REVIEW

Our review of a ruling on motion for new trial depends on the basis of the motion. *Westco Agronomy Co., LLC v. Wollesen*, 909 N.W.2d 212, 219 (Iowa 2017). Hatfield first claims that the court made an error of law in determining that Union Pacific met its burden to prove the conditions of Iowa Rule of Civil Procedure 1.1004(7) in its motion for new trial. But Hatfield also

claims, without citation to authority, that de novo review applies here. Union Pacific correctly observes that abuse-of-discretion review applies to district court rulings on motions for new trial based on claims of newly discovered evidence. *See Carter v. Carter*, 957 N.W.2d 623, 631 (Iowa 2021). "We give a district court wide discretion in ruling on a petition to vacate the judgment or grant a new trial based upon newly discovered evidence and an abuse of discretion is needed for reversal." *Id.* "We are more reluctant to interfere with the grant of a new trial than its refusal." *Kiner v. Reliance Ins. Co.*, 463 N.W.2d 9, 13 (Iowa 1990). "We will only find an abuse of discretion if the trial court clearly exercised its discretion on untenable grounds or acted unreasonably." *Benson v. Richardson*, 537 N.W.2d 748, 762 (Iowa 1995). We thus review Hatfield's claim that the district court erred in granting a new trial for an abuse of discretion.

We review rulings on motions for directed verdict and judgment notwithstanding the verdict for correction of errors at law. *In re Detention of Hennings*, 744 N.W.2d 333, 340 (Iowa 2008); *Van Sickle Const. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010) "It is only in the plainest cases, in which reasonable minds could come to no other conclusion, that we decide a question of contributory negligence as a matter of law." *Peters v. Howser*, 419 N.W.2d 392, 394 (Iowa 1988).

We generally review rulings on motions for sanctions for abuse of discretion. *Barnhill v. Iowa Dist. Ct.*, 765 N.W.2d 267, 272 (Iowa 2009). Under this review, we will also correct erroneous applications of the law. *Id.*

## ERROR PRESERVATION

We first address concerns about whether Union Pacific failed to preserve error on its argument in its motion for new trial based on "newly"

discovered evidence given its failure to move for mistrial. The 705 report and switch list were revealed to exist while the jury was deliberating. Upon Thoen's disclosure that the report and list existed, the parties agree that they discussed next steps with the presiding judge in an unreported conversation. Regardless of what either party urged at that meeting, the court then permitted the jury to continue deliberation. Despite that, neither party moved for mistrial at that time.

Our supreme court has declared that "it is axiomatic that counsel for a party cannot sit idly by and not attempt to direct the attention of the trial court to a possible limitation or restriction on the use of evidence and then, after an unfavorable verdict, take advantage of an error which he could and should but did not call to the court's attention." *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 660 (Iowa 1969) (citation omitted). "[E]rrors to which objection could be made at trial may not be raised for the first time as grounds for new trial." *Rudolph v. Iowa Methodist Med. Ctr.*, 293 N.W.2d 550 (Iowa 1980).

In *State v. Radeke*, 444 N.W.2d 476, 479 (Iowa 1989), our supreme court applied this doctrine specifically to the failure to move for a mistrial. The court held that "a failure to request a mistrial for alleged misconduct by opposing counsel must be asserted before the issues are submitted to the jury," reasoning that "[i]n permitting the case to be submitted to the jury without asserting the denial of a fair trial by reason of the alleged misconduct, [the] defendant's counsel indicates a willingness to take a chance on a favorable verdict and waives the claim of misconduct." *Radeke*, 444 N.W.2d at 479.

Issues must be *both* argued and ruled on below. *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("[I]ssues must ordinarily be both raised and

decided by the district court before we will decide them on appeal."). And because Union Pacific failed to raise this evidentiary issue in a motion for mistrial prior to the jury returning a verdict, we question whether the issue was properly raised in the district court—regardless of the company's motion for new trial. Nonetheless, our supreme court has stated that a district court retains *discretion* to grant a new trial under rule 1.1004 even when a party has lost its *right* to consideration of a new trial by failing to preserve error. *See Loehr v. Mettille*, 806 N.W.2d 270, 278 (Iowa 2011) ("The trial court is not bound by the record in the same way that the appellate courts are. Therefore, it is not invariably an abuse of discretion for a trial judge to grant a motion for new trial based on a matter that could have been raised earlier, but was not." (internal citation omitted)).

So the appeal before us presents a unique scenario where an appellant may have failed to preserve error on an appealable issue but that issue is still properly before us on appeal. But we still address this issue to emphasize the importance of error preservation because it "disallows sandbagging—that is, it does not allow a party to choose to remain silent in the trial court in the face of error, take a chance on a favorable outcome, and subsequently assert error on appeal if the outcome in the trial court is unfavorable." *Olson v. BNSF Ry. Co.*, 999 N.W.2d 289, 296 (Iowa 2023) (cleaned up). That is what happened here. We aim to caution litigants that they are rolling the dice on future appeals when they fail to move for mistrial prior to a verdict and later move for new trial when they receive an adverse verdict. In such cases, the district court may retain discretion to rule on the party's new-trial motion but would not be required to do so. And if it does not do so, the party that failed to move for mistrial would have no recourse on appeal. But since the court here did, in fact, decide to rule on the new-trial motion, we proceed to the merits.

# DISCUSSION

## I.     New Trial

Hatfield's primary claim is that Union Pacific did not meet its burden under Iowa Rule of Civil Procedure 1.1004(7) to show that its substantial rights were materially affected by the newly discovered 705 report and switch list. In his brief, Hatfield argues that the evidence "(a) was produced more than three months after the verdict by one of [Union Pacific's] former employees (b) supported Hatfield's description of the subject incident and (c) had no relevance to the damages Hatfield sustained from the incident."

Under Iowa Rule of Civil Procedure 1.1004(7), the district court may grant a new trial if the "movant's substantial rights" were "materially affected" by "[m]aterial evidence, newly discovered, which could not with reasonable diligence have been discovered and produced at the trial." "[N]ewly discovered evidence is evidence that existed at the time of trial but for some justifiable reason was not produced at trial."[3] *D.W.*, 385 N.W.2d at 583. The movant must show that the newly discovered evidence (1) could not, "in the exercise of due diligence, have been discovered prior to the conclusion of the trial;" (2) "is material and not merely cumulative or

---

[3] By definition, "newly discovered evidence" must not have been "produced at trial." *In re D.W.*, 385 N.W.2d 570, 583 (Iowa 1986). Because the jury was still considering issues of fact at the time the parties were informed of the 705 report's existence, the trial was still ongoing and we question whether it constitutes "newly discovered" evidence under rule 1.1004(7). *See State v. Jefferson*, 545 N.W.2d 248, 250 (Iowa 1996) (finding a motion for new trial was "the wrong remedy" where the defendant discovered material evidence during jury deliberations but failed to move to reopen the record). But since Hatfield has not raised this argument on appeal and otherwise prevails on the newly-discovered-evidence issue, we do not further address this wrinkle.

impeaching;" and (3) that a new trial would probably change the result. *Id.* (quoting *In re Marriage of Steenhoek*, 305 N.W.2d 448, 452 (Iowa 1981)).

Trial courts have "considerable latitude in determining" the movant exercised due diligence in discovering the evidence. *Westergard v. Des Moines Ry. Co.,* 52 N.W.2d 39, 43–44 (Iowa 1952). The court will consider whether the movant made a "reasonable effort." *Id.* at 44. That does not mean that the movant must have "sought evidence where [the movant] had no reason to apprehend any existed" or "interview[ed] persons or [searched] in places where there is no indication of any helpful evidence." *Id.* Rather, the movant "must exhaust the probable sources of information concerning his case; he must use that of which he knows." *Id.* We approach Hatfield's claim with the recognition that "[m]otions for new trial based on newly discovered evidence are disfavored." *Koss v. Iowa Chi. & E. R.R.*, No. 07–1383, 2008 WL 4876997, at *1 (Iowa Ct. App. Nov. 13, 2008) (citing *Benson v. Richardson*, 537 N.W.2d 748, 762 (Iowa 1995)).

Here, we agree with the trial court's assessment that the newly discovered reports could not have been uncovered through Union Pacific's reasonable efforts. Hatfield urged the district court to find that report could have been discovered with reasonable efforts or that Union Pacific fraudulently "buried" the report. As the district court determined, the record lacked evidence of either conclusion:

> Thoen is not a friend to either party—he is hostile to and suspicious of both Hatfield and Union Pacific.
>
> Thoen was listed by [Union Pacific] as a potential witness for trial. He was deposed, claimed no memory of this incident, and did not produce these documents. Thoen asked not to be called at trial, and [Union Pacific] accommodated that wish. At no time in pretrial proceedings or before the close of evidence did Thoen indicate he had documents related to the incident. Even when he did show the documents to [Union Pacific]'s

counsel, he did not turn them over and was—in the common vernacular—weird about it.

> . . . .

> . . . [T]he Court is not sufficiently convinced that [Union Pacific] still had the report in its records, found it and "buried" it, or even that the report ever got to a [Union Pacific] supervisor in the first place. And a marked-up switch list was probably never in the possession of Union Pacific. In whole, substantial evidence of misconduct, bad faith, or willful violation of discovery obligations is not present.

(Citation omitted).

The district court determined that, based on the available record evidence, Thoen possesses the only copy of the 705 report and switch list in existence. The court emphasized that Thoen's "cagey" responses to questioning, even when finally unveiling the documents, would have made it difficult for Union Pacific to uncover the documents independently:

> Even today, after evidentiary hearing, much about Thoen's possession and delivery of the two documents is speculative. The switch list was likely his "work order" for the day in question. Thoen *probably* got the 705 report form from a Union Pacific supervisor. He *might have* filled it out at the request of a supervisor. He *might have* turned it in to a supervisor and been provided a copy. A Union Pacific supervisor *might have* lost or discarded it. None of this is clearly established, and—given the whole of the circumstances—the Court finds Thoen's actions suspicious and his testimony cagey.

Union Pacific's discovery of the report and list were dependent on Thoen's compliance and transparency as a witness, contrary to Hatfield's claim that "Union Pacific had or easily could have had the evidence years before the conclusion of the trial." We credit the district court's credibility determination that Thoen's responses to questioning made it difficult to assess if Union Pacific was in possession of an original copy of the 705 report or switch list.

Hatfield also contends that Thoen's possession of the documents should be imputed to Union Pacific more broadly, as it is well-settled that "a corporation cannot, in order to escape liability for the wrongful acts of its agents or employees, assert that such acts were beyond the scope of its corporate power, or that they occurred in connection with a transaction beyond the scope of such power." *Mortimer v. Farmers' Mut. Fire & Lightning Ins. Ass'n,* 249 N.W. 405, 407 (Iowa 1933). Union Pacific counters that Thoen was not an officer-director of Union Pacific, thus he did not trigger an automatic imputation of knowledge not otherwise disclosed to Union Pacific. *See Regal Ins. v. Summit Guar. Corp.*, 324 N.W.2d 697, 703–04 (Iowa 1982) ("As a general proposition knowledge or notice of an officer-director of a corporation is imputed to the corporate entity even if it is never actually disclosed to the corporation."); *Midwest Direct Logistics, Inc. v. Twin City Tanning Waterloo, LLC*, No. 15-CV-2013, 2016 WL 4467913, at *6 (N.D. Iowa Aug. 23, 2016) (holding that the knowledge of a non-officer of a company could not be imputed to the business entity when that non-officer "had no authority for determining" the company policy in question).

Hatfield cites to *United States v. Dico, Inc.* for the proposition that any employee's knowledge is automatically imputed to the corporate entity, such that "[g]enerally, 'the knowledge of the employees is the knowledge of the corporation.'" 265 F.Supp.3d 902, 954 (S.D. Iowa 2017) (citation omitted). But the court went on to state that such imputations apply to the

> knowledge of officers and key employees of a corporation, obtained while acting in the course of their employment and within the scope of their authority, is imputed to the corporation itself. Furthermore, knowledge by a corporation, obtained by and through its officers and key employees, of facts of continuing importance to the business of the corporation, even after the termination of services of that officer or employee, is conclusive upon the corporation.

15

*Id.* (citation omitted).

Assuming without deciding that such knowledge is imputed to the company, Hatfield's argument on this point runs into a problem. If we take Thoen at his word, he had no knowledge of the report's existence at the time he was initially deposed. So, if the report was never officially filed with Union Pacific as it suggests, and Thoen did not remember filling out such a report as he suggests, there was no knowledge to impute from Thoen to Union Pacific until Thoen uncovered the report and informed Union Pacific. And even if we take this a step further and impute Thoen's knowledge of the report's existence to Union Pacific, Union Pacific has demonstrated the efforts it undertook via Thoen to uncover that lost report and provide it to Hatfield. It would be no different than if Union Pacific had conceded from the beginning that a years-old report existed but had been legitimately misplaced and Union Pacific engaged in consistent good-faith effort to find that lost report. Hatfield's imputed-knowledge argument is thus intimately intertwined with his argument that Union Pacific "buried" the report—a claim which we find unsupported on this record.

The second requirement in a newly-discovered-evidence claim is that the evidence "is material and not merely cumulative or impeaching." *D.W.*, 385 N.W.2d at 583 (citation omitted). At first glance, Hatfield's argument on this point seems compelling: the newly discovered reports are cumulative because they support Hatfield's description of the incident and thus do not change the damages calculation.

But despite initial appearances, the evidence here is not cumulative. Absent the newly discovered documents, the only evidence pertaining to the facts of the rough-coupling incident came from Hatfield. Nelson did not remember any such incident, and Hatfield's recollection left key details

unanswered, such as why the railcar count was off. Hatfield was blind as to what was occurring on the track. The 705 report and switch list would help establish that Thoen was looking at the wrong track when providing counts. The documents also provide insight into the incident from a perspective closer in time than Hatfield's recollections during testimony at trial. And these reports are a different type of evidence—written documents unlike Hatfield's oral testimony. *See Westergard*, 52 N.W.2d at 42.

Turning to the third prong of the Rule 1.1004(7) analysis—whether the newly discovered evidence might reasonably be expected to change the result of trial—Union Pacific runs into some problems.

The 705 report is unquestionably helpful to Hatfield's theory of the case. And it was Union Pacific's burden to show the new evidence would have probably changed the result in its favor. *D.W.*, 385 N.W.2d at 583. In its order, the district court observed that both the report and the switch list corroborated the occurrence of the hard coupling—which the district court also explained was "an occurrence consistently questioned by [Union Pacific]" at trial. That analysis, combined with the district court's statement that "everyone agrees now that [Union Pacific's] liability theory is largely wrong," displays the district court's awareness of how the new evidence strengthens Hatfield's case.

Although we are cognizant of the abuse-of-discretion standard, we are also left with little explanation for why a new trial is justified here. The district court's reasoning simply concluded that "a jury could find that Hatfield needs more (or less) psychological care" or experienced "higher (or lower) pain and suffering" than "if he did not contribute to the hard coupling." Yet there was no explanation for why the report would have provided stronger evidence of Hatfield's contribution to the hard coupling.

Thoen already testified in his deposition that he never "set up an employee to become injured and [he] think[s] it would be foolish to do so." Both the testimony and the report are Thoen's account of the events. But unlike Thoen's newly discovered 705 report, Thoen's deposition was taken under oath. So the primary angle in which the report could conceivably assist Union Pacific—showing a lack of malicious intent by Thoen—was already available to Union Pacific via Thoen's deposition testimony to the same.

We are further unconvinced by Union Pacific's argument that the report would have prevented admission of evidence at trial of the threats Hatfield had received from coworkers. The report is not definitive or objective proof that the threats Hatfield received played no part in the hard coupling. Indeed, if Thoen had purposefully given Hatfield incorrect car counts, it seems unlikely that he would document that misconduct in his own incident report. So we see no reason why the report's admission would have prevented admission of evidence of the threats. Accordingly, we reverse the portion of the district court's order granting Union Pacific's motion for new trial and remand for entry of an order consistent with this opinion.

## II.    Motions for Directed Verdict and Judgment Notwithstanding the Verdict

Hatfield asks us to find that the district court erred in failing to grant both his motion for directed verdict and motion notwithstanding the verdict on the issue of his comparative negligence for the hard-coupling incident. Citing *Dixon v. Penn Cent. Co.*, 481 F.2d 833, 837 (6th Cir. 1973), Hatfield argues that Union Pacific did not offer "affirmative evidence" of his fault and that the jury's finding was dependent on "nothing but the incredibility of [his] testimony," which is which is not sufficient for a comparative negligence finding in a FELA negligence case.

While Hatfield's characterization of the defendant's burden in FELA cases is accurate, we disagree with his claim that Union Pacific presented no affirmative evidence of his fault. We agree with the district court that Union Pacific presented sufficient evidence for reasonable jurors to disagree on the issue of comparative negligence. *See Howser*, 419 N.W.2d at 394. And that evidence was clearly persuasive considering the jury's 50/50 fault determination. Union Pacific highlighted that Hatfield was prescribed opioids at the time of the incident, had not informed Union Pacific of those prescriptions, and delayed his report of the hard coupling by three days—which it argued allowed Hatfield to avoid drug testing. Union Pacific additionally presented evidence that engineers were not permitted to exceed four miles per hour while engaged in coupling and that an event recorder showed him traveling over double that speed limit. Hatfield's contention that he was traveling over that limit because he was not anticipating the coupling is a fact question that should be, and was, submitted to jury. Lastly, Hatfield testified to the occurrence of a job briefing that he did not testify to during his deposition. Failure to hold that briefing would have been a safety rule violation. The occurrence or non-occurrence of that briefing is also a fact question that was within the jury's purview.

Union Pacific presented sufficient evidence for its affirmative defense that Hatfield contributed to the hard-coupling incident. The jury was not required to credit Hatfield's testimony rebutting that evidence. *See Dixon*, 481 F.2d at 837 (noting "a jury may always disbelieve a witness," and so "the credibility of a plaintiff is always in issue"). The jury was still permitted to consider Hatfield's credibility. *See id.* The district court did not err in submitting the issue to the jury or in denying Hatfield's motion notwithstanding the verdict.

## III.    Motion for Sanctions

Hatfield argues the district court erred in denying his motion for sanctions and declining to strike the jury's comparative negligence findings from the verdict as a sanction for Union Pacific's failure to produce the 705 report and switch list before the case was submitted to the jury. Under Iowa Rule of Civil Procedure 1.517(2)(b) and (3)(a), a district court has power to sanction a party for unjustified failure to comply with discovery rules or otherwise provide information and to prevent that party from using the undisclosed information or discovery material at trial.

Hatfield presents no evidence for his claim that Union Pacific engaged in "misconduct, bad faith, or willful violation of discovery obligations." Nor has he shown that its attorneys acted with "willfulness, fault or bad faith" in failing to disclose the 705 report or switch list. *Troendle v. Hanson*, 570 N.W.2d 753, 757 (Iowa 1997). Hatfield also argues that knowing concealment is not required to sanction nondisclosure. But rule 1.517(2)(b) specifically requires that the failure to permit discovery be committed by "an officer, director, or managing agent of [Union Pacific]" for sanctions to be imposed. Thoen fills none of those roles. Thoen failed to disclose the report to Union Pacific, and the district court expressly found Thoen's "actions suspicious and his testimony cagey." So Thoen's failure to fully cooperate during discovery would have made it impossible for Union Pacific to disclose the report absent some bad faith coordination between Thoen and the company or evidence that the company likely had other copies in its possession. The court did not abuse its discretion or commit legal error in declining to impose sanctions.

## CONCLUSION

In conclusion, we reverse the portion of the district court's order granting Union Pacific's motion for new trial and remand for entry of an order reinstating the jury verdict in full. But we affirm the district court's denial of Hatfield's post-trial motions.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**